**William K. Hanagami, CA SBN 119832**
**HANAGAMI LAW**
**A Professional Corporation**
**913 Tahoe Boulevard, Suite 5**
**Incline Village, NV 89451-7414**
**(833) 716-8570 / (833) 716-8569** *FAX*
**Bill@Hanagami.com**

**Byron T. Ball, CA SBN 150195**
**THE BALL LAW FIRM**
**100 Wilshire Boulevard, Suite 700**
**Santa Monica, CA 90401-3602**
**(310) 980-8039**
**btb@balllawllp.com**

**Gregory J. Morrow, CA SBN 153224**
**MORROW LAW GROUP**
**10401 Wilshire Boulevard, Suite 1102**
**Los Angeles, CA 90024-4609**
**(310) 894-9149 / (310) 470-9013** *FAX*
**gregory.j.morrow@hotmail.com**

Attorneys for Plaintiff and *Qui Tam* Relator,
Leiasa Beckham

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* LEIASA BECKHAM, and STATE OF CALIFORNIA, *ex rel.* LEIASA BECKHAM, <br><br> Plaintiffs, <br><br> vs. <br><br> 1850 BRYANT LAND LLC, KASLOFSKY & ASSOCIATES LLC, THURSTON KASLOFSKY, CHRISTOPHER PAUL FOLEY, DOUGLAS ROSS, SAN FRANCISCO COMMUNITY INVESTMENT FUND, CITY AND COUNTY OF SAN FRANCISCO, and NAOMI KELLY, <br><br> Defendants. | CASE NO.:  3:21-cv-05742-RS <br><br> THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT AND CALIFORNIA FALSE CLAIMS ACT; DEMAND FOR JURY TRIAL |

COMES NOW, Plaintiff and *Qui Tam* Relator Leiasa Beckham, individually and on behalf of the United States of America and the State of California, and alleges as follows:

-1-

<u>INTRODUCTION</u>

Defendants 1850 Bryant Land LLC, Kaslofsky & Associates LLC, Thurston Kaslofsky, Christopher Paul Foley, and Douglas Ross entered into a secret "Backroom Deal" with defendants City and County of San Francisco (San Francisco), San Francisco Community Investment Fund (SFCIF), and Naomi Kelly, among others, in which the former defendants would develop and lease or sell the real property located at 1850 Bryant Street, San Francisco, California (Subject Property) to defendant San Francisco as a Single-Use City Facility, a portion of which San Francisco would lease to the University of California at San Francisco (UCSF). However, Defendants knew that the Subject Property did not have local community support needed for the development of the Subject Property for such purpose, which was necessary for the San Francisco Planning Commission's permitting approval of the development as a Single-Use City Facility.

Defendants devised a scheme to obtain community support for the development of the Subject Property by fraudulently representing to the local community and nonprofit organizations that the Subject Property would be developed as a Nonprofit Multi-Tenant Center project, of which condominiums would be sold to various nonprofit organizations to serve the local community, when in fact Defendants knew that Defendants 1850 Bryant Land LLC, Kaslofsky & Associates LLC, Thurston Kaslofsky, Christopher Paul Foley, and Douglas Ross had no intention of selling such condominiums to the nonprofit organizations. Defendants made such false misrepresentations to gain community support for the development of the building, which was necessary for the San Francisco Planning Commission's permitting approval of the development. After the Planning Commission approved the development of the building as a Nonprofit Multi-Tenant Center project with the local community's support, Defendants' scheme was to refuse to proceed with the sale of the condominiums to the nonprofit organizations, and to instead seek an administrative variance (without the need for a public hearing or local community support) from the San Francisco Planning Department to permit approval of the development as a Single-Use City Facility and proceed with their plans to lease or sell the building to San Francisco as a Single-Use City

Facility, a portion of which was to be leased to UCSF (which does not constitute a Nonprofit Multi-Tenant Center project).  Defendants intended and knew that their fraudulent scheme would result, and did result, in the nonprofit organizations applying for and obtaining grant funds originating from the United States (Government) and California based upon the nonprofit organizations believing that they would purchase business condominiums at the Subject Property.  As part of Defendants' scheme, Defendants used the approval of such grants to the nonprofit organizations in seeking the Planning Commission's approval of the Subject Property's development as a Nonprofit Multi-Tenant Center project.

In violation of the Federal and California False Claims Acts, Defendants' frauds resulted in the application for, and award of, millions of dollars in grant funds originating from the Government and/or California to the nonprofit organizations which were based upon such nonprofit organizations supposedly purchasing business condominiums at the Subject Property as a Nonprofit Multi-Tenant Center project.

## JURISDICTION AND VENUE

1.    Plaintiff and *Qui Tam* Relator Leiasa Beckham (Beckham) files this action on behalf and in the name of the United States Government (Government) and the State of California (California) seeking damages and civil penalties against the Defendants for violations of 31 U.S.C. § 3729(a) and *California Government Code* § 12651, respectively.

2.    This Court's jurisdiction over the claims for violations of 31 U.S.C. § 3729(a) and *California Government Code* § 12651 is based upon 31 U.S.C. § 3732(a) and 31 U.S.C. § 3732(b), respectively.

3.    Venue is vested in this Court under 31 U.S.C. § 3732(a) because at least one of the Defendants transacts business in San Francisco in the Northern District of California and many acts constituting violations of 31 U.S.C. § 3729(a) occurred in San Francisco in the Northern District of California.

## INTRADISTRICT ASSIGNMENT

4.    Pursuant to L.R. 3-2(c) and 3-5, assignment of this action to the San Francisco Division is proper because many acts constituting violations of 31 U.S.C. § 3729(a) occurred

1  in the City and County San Francisco.

2                                THE PARTIES

3        5.      Beckham is a resident and citizen of the United States, the State of California,

4  and of this District.  Beckham brings this action on behalf of the Government under 31 U.S.C.

5  § 3730(b) and on behalf of California under *California Government Code* § 12652(c).

6        6.      Defendants Thurston Kaslofsky (Kaslofsky), Christopher Paul Foley (Foley) and

7  Douglas Ross (Ross) are individuals doing business in this District.

8        7.      Defendant 1850 Bryant Land LLC (Bryant Land) is a California limited liability

9  corporation located in and doing business in this District.  At all times relevant, Foley and

10  Ross were and are the managers and/or members of Bryant Land.  The Defendants in this

11  paragraph are collectively referred to as the "Bryant Land defendants."

12        8.      Defendant Kaslofsky & Associates LLC (K&A) is a California limited liability

13  corporation located in and doing business in this District. Kaslofsky is the manager and/or

14  member of K&A.  The Defendants in this paragraph are collectively referred to as the

15  "Kaslofsky defendants."  At all times relevant, the Kaslofsky defendants acted as consultant

16  and agent of the Bryant Land defendants.

17        9.      Defendant City and County of San Francisco (San Francisco) is a consolidated

18  city-county in California.

19        10.     Beckham is informed and believes, and upon such information and belief

20  alleges, that defendant San Francisco Community Investment Fund (SFCIF) is a California

21  nonprofit corporation, and that at all times relevant all of SFCIF's board members and staff

22  were also employees of San Francisco.

23        11.     At all times relevant, defendant Naomi Kelly (Kelly) was the City Administrator

24  for San Francisco, a committee member of the San Francisco Capital Committee, and a board

25  member and/or officer of SFCIF.

26                            GENERAL ALLEGATIONS

27        12.     Beckham is a highly credentialed real estate developer who has about twenty

28  (20) years of real estate experience specializing in grassroots development projects that serve

-4-

the affordable housing social enterprise, and nonprofit sectors. She holds a Master's degree in Urban Studies and Planning from Massachusetts Institute of Technology and a Bachelors' of Science in Urban Affairs and Planning from City University of New York City and has worked on several notable projects in the city of San Francisco, including: The City of San Francisco's Central Market Economic Strategy, Community Arts Stabilization Trust, San Francisco Nonprofit Displacement Program, the Artist Replacement Building for the Hunter's Point Shipyard, and the San Francisco Community Land Trust's 55 Columbus in Chinatown. As such, and over the course of her career, Beckham has become widely recognized by her peers as an expert in the field of non-profit real estate development and finance.

13.     Formerly a Senior Real Estate Consultant at Northern California Community Loan Fund (NCCLF) in which she assisted nonprofits in securing more than 500,000 sq. ft. of commercial space, Beckham decided to establish her own company as she wanted to specialize in and exclusively focus on ethical redevelopment commercial real estate transactions. In doing so, Beckham recruited defendant Kaslofsky—a former employee of the San Francisco Redevelopment Agency—to partner with her in establishing the company.

14.     On April 27, 2016, Beckham and Kaslofsky founded Common Ground Urban Development, LLC, a California limited liability company (Common Ground), with the stated goal of building inclusive equitable real estate development projects that leverage the unrealized potential of distressed properties.  At that time, and as a limited liability company, Beckham and Kaslofsky were each considered a "Manager" of Common Ground.  Common Ground's first—and only—project at the time was working on the real property development project located at 1850 Bryant Street, San Francisco, California (the "Subject property").  The real estate development project of the Subject Property as represented by the defendants to Beckham and the general public is referred to as "1850 Bryant Street project."  The 1850 Bryant Street project was promoted to be a 172,000 sq. ft. new construction Nonprofit Multi-Tenant Center in San Francisco's Mission District, business condominiums of which were to be purchased and occupied by nonprofit organizations serving the local community.

15.     Beckham bases her allegations that the Defendants violated the federal False

Claims Act, 31 U.S.C. §§ 3729, et seq. (FCA), and California False Claims Act, *California Government Code* §§ 12650, et seq. (CFCA), based upon, among other things, (a) her professional experience and expertise, (b) her working on the 1850 Bryant Street project, (c) her personal interactions with the Defendants, nonprofit organizations that agreed to purchase business condominiums in the 1850 Bryant Street project's Nonprofit Multi-Tenant Center, and members of the local community, (d) review of defendant Kaslofsky's email correspondence sent through or received by Common Ground's email server, and (e) her review of documents she obtained from San Francisco pursuant to the San Francisco Sunshine Ordinance (San Francisco Administrative Code, Chapter 67).

<u>DEFENDANTS' FRAUDULENT SCHEME</u>

16.     At all times relevant, the Bryant Land defendants held an option to purchase, or owned after executing such option, the Subject Property.

17.     During and after 2014, all Defendants and their below-mentioned employees and agents were aware that:

(a)     The Bryant Land defendants needed the San Francisco Planning Commission's approval to develop the Subject Property;

(b)     Obtaining the San Francisco Planning Commission's approval to develop the Subject Property required the support and approval of the local community;

(c)     The local community would oppose the development of Subject Property into a Single-Use City Facility owned or leased by San Francisco, with a portion thereof to be leased to UCSF;

(d)     The local community's opposition to developing the Subject Property would result in the Planning Commission not approving such development;

(e)     The local community would support and approve of the development of the Subject Property into a Nonprofit Multi-Tenant Center, business condominiums of which were to be purchased and occupied by nonprofit

-6-

organizations that provided services to the local community; and

(f)     Nonprofit organizations that provided services to the local community needed federal and/or state grant funds to acquire business condominiums at the Subject Property and support their operations.

18.     At all times relevant since about May 2014, San Francisco and its employees, including but not limited to John Updike (San Francisco's Director of Real Estate), Olson Lee of the Mayor's office, Mohamed Nuru (Director of Public Works), and Trent Rhorer (Executive Director of Human Services Agency), SFCIF and Kelly wanted the Subject Property to be developed into a Single-Use City Facility to be used in whole or in part by San Francisco's departments and agencies, including but not limited to its Police Department's Special Investigations Division, and a portion of which was to be leased to UCSF. However, San Francisco and its above-mentioned employees, knew that they would not be able to obtain local community support for the development of the Subject Property for such use, and therefore would not be able to obtain Planning Commission approval for the Subject Property as a Single-Use City Facility.  Accordingly, during or about March or April 2015, San Francisco employees, including but not limited to, Updike, Lee, Nuru, Rhorer and Kelly, among others, approached Foley and Ross and formed a "Backroom Deal" that San Francisco would enter into a long term lease of, or purchase, the Subject Property, as a Single-Use City Facility for use by San Francisco's Police Department and other city departments (a portion of which was to be leased to UCSF),[1] and San Francisco would sell the real property located at 170 Otis Street, San Francisco, California (170 Otis) at favorable terms to the Bryant Land defendants if the Bryant Land defendants were able to develop the Subject Property as a Single-Use City Facility.  Because San Francisco, its above-mentioned employees, and the Bryant Land defendants knew that the local community would not support such a development, and that local community support was required to develop the Subject Property

[1]San Francisco and UCSF entered into agreements dated, among others, July 15, 2015, February 13, 2017, July 13, 2018, and October 18, 2018 in which San Francisco would lease a portion of the Single-Use City Facility to UCSF.

-7-

into a Single-Use City Facility, the Bryant Land defendants, Updike, Lee, Nuru, Rhorer, Kelly, and San Francisco, among others, decided that in order to obtain local community support for the development and Planning Commission approval, that they would misrepresent to the local community and the Planning Commission that the Subject Property would be developed into a Nonprofit Multi-Tenant Center project, which would house the operations of nonprofit organizations serving the local community. As part of the scheme, said Defendants and above-mentioned San Francisco employees agreed that after the Planning Commission approved the project for a Nonprofit Multi-Tenant Center project with support from the local community, Defendants would have the project's development approval modified administratively, without a public hearing nor local community input, as a Single-Use City Facility so that San Francisco could lease or purchase the Subject Property and lease a portion of it to UCSF.

19.     On or about November 20, 2015, Ross and Foley formed defendant Bryant Land, and shortly thereafter Bryant Land acquired an option to purchase the Subject Property.

20.     In furtherance of the fraudulent scheme, on or about January 19, 2016 the Bryant Land defendants submitted an application to the Planning Commission for a conditional use authorization to develop the Subject Property into a Nonprofit Multi-Tenant Center.

21.     Beckham is informed and believes, and upon such information and belief alleges, that by February 2016 Kaslofsky became aware of and agreed to participate in Defendants' Backroom Deal. During or about February 2016, Kaslofsky, working as a consultant and agent for the Bryant Land defendants, had meetings with the San Francisco Office of Community Investments and Infrastructure regarding general obligation bond financing for the development of the Subject Property into a Single-Use City Facility. Such bond financing is incompatible with the development of, and nonprofit acquisition of business condominiums at, the Nonprofit Multi-Tenant Center.

22.     During or about Summer and Fall of 2015, Bryant Land's Foley and Ross advised Beckham that the 1850 Bryant Street project involved the development of the Subject Property into a Nonprofit Multi-Tenant Center, business condominiums of which were to be purchased and occupied by nonprofit organizations that provided services to the local

community.  Foley and Ross advised Beckham that they wanted to retain her services to facilitate and obtain the entitlements and financing for the 1850 Bryant Land project, including but not limited to (a) obtaining San Francisco Planning Commission approval for the development of the Subject Property into a Nonprofit Multi-Tenant Center, and (b) assisting the Nonprofit purchasers of business condominiums at the Nonprofit Multi-Tenant Center to obtain financing, through among other things, federal and/or state funded grants for the Nonprofits' down payment and/or debt service payments of mortgage loans to be used towards their acquisition of such business condominiums.

23.    During or about April 2016, defendant Bryant Land retained Common Ground to facilitate and obtain the entitlements and financing for the 1850 Bryant Land project, including but not limited to (a) obtaining San Francisco Planning Commission approval for the development of the Subject Property into a Nonprofit Multi-Tenant Center, and (b) helping the Nonprofit purchasers of business condominiums at the Nonprofit Multi-Tenant Center to obtain financing, through among other things, federal and/or state funded grants for Nonprofits' down payment and/or debt service payments of mortgage loans to be used towards their purchase of such business condominiums.  Common Ground agreed that this was to be an exclusive arrangement (i.e., Common Ground would not perform work for any other project) through about December 2017.

24.    During and between 2015 and 2018, the Bryant Land defendants, the Kaslofsky defendants, Beckham, and San Francisco's Lex Leifheit (Nonprofit Business Development Manager of San Francisco's Office of Economic and Workforce Development), Lee, Nuru, and Kelly, among others, advised various nonprofit organizations in numerous telephone calls to all Nonprofit Partners; numerous emails by the Bryant Land defendants, Kaslofsky, K&A, Lee's staff (including but limited to Brian Chu and Leifheit), Nuru and his staff (including but not limited to Mindy Linetzky), and Kelly's staff (including but not limited to Jamie Querubin and Holly Lung) to all Nonprofit Partners between July 2015 and December 2018, and Beckham's emails to nonprofit organizations including the Nonprofit Partners between and during and between 2015 and 2017; numerous meetings by the Bryant Land defendants,

-9-

Kaslofsky and Leifheit at least weekly with the Nonprofit Partners during and between 2015 and 2018; Beckham's near daily meetings with the Nonprofit partners during 2016 and 2017; and weekly written promotional materials provided by Foley, Beckham, Kaslofsky, K&A to nonprofit organizations during 2016 and 2017; Common Ground's website; and newspaper articles (see, https://www.sfgate.com/bayarea/article/SF-complex-planned-to-permanently -house-social-10901814.php, https://missionlocal.org/2017/04/developers-plan-project-entirely -to-permanently-house-nonprofits/, and https://communityvisionca.org/san-francisco -nonprofits-secure-long-term-leases-with-one-million-in-funds/) about the Bryant Land defendants' purported intent to develop the Subject Property into a Nonprofit Multi-Tenant Center project that would provide nonprofit services to the local community.

25.     In reliance thereon, during and between 2015 and at least 2018, nonprofit organizations, including but not limited to San Francisco Conservation Corps (SFCC), Goodwill, Mission Neighborhood Centers, Horizons Unlimited, Blue Bear School of Music, TIDE, and Muttville (collectively, "Nonprofit Partners") agreed to purchase condominiums at the Subject Property and at least annually applied for and/or obtained grant funds (for the down payment and/or mortgage debt service) originating from Government agencies, including but not limited to the Department of Health and Human Services (HHS) and the Department of Housing and Urban Development (HUD), and California agencies, including but not limited to CalRecycle, California State Proposition 40 Acquisition Fund, California Natural Resources Agency, California Department of Education, and California Conservation Corps, with the understanding and requirement that such Nonprofit Partners were purchasing condominiums for their respective operations to serve the local community at the Subject Property Nonprofit Multi-Tenant Center project. Beckham is informed and believes, and upon such information and belief alleges, that such grant applications that were submitted and awarded include, but are not limited to:

i.     SFCC grant applications that were submitted and awarded:

-10-

(1)     For Fiscal Year (FY) 2015/2016[2] and FY 2016/2017, SFCC applied for and was awarded down payment grants of $25,000 and $765,200 (awarded May 22, 2017), respectively, from the San Francisco Mayor's Sustainability Initiative (involving federal and California funds);

(2)     For FY 2015/2016 and FY 2018/2019, SFCC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amounts of $1,585,725, and $1,701,030, respectively, from CalRecycle;

ii.     Goodwill grant applications that were submitted and awarded:

(1)     For FY 2015/2016, Goodwill applied for and was awarded an operating grant, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amount of $95,871 from the Department of Labor under the Federal Workforce Investment Act;

(2)     For FY 2015/2016, Goodwill applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the total amount of $60,546,921 from San Francisco (involving federal and California funds);

iii.     Mission Neighborhood Centers (MNC) grant applications that were submitted and awarded:

(1)     For FY 2016/2017 and FY 2017/2018, MNC applied for and was awarded a down payment grants in the amounts of $500,000 and $1,200,000 (awarded March 28, 2018), respectively, from the

---

[2]Each Fiscal Year (FY) begins on June 1 through May 31.  For example, FY 2015/2016 is from June 1, 2015 through May 31, 2016.

Low Income Investment Fund (involving federal and California funds);

(2)    For FY 2016/2017, MNC applied for and was awarded down payment grants in the total amounts of $1,000,000 and $1,000,000 from NCCLF  (awarded November 2017 and involving federal and California funds) and San Francisco (awarded March 5, 2018 and involving federal and California funds), respectively;

(3)    For FY 2016/2017, MNC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amount of $4,589,193 from the Federal Head Start program;

(4)    For FY 2016/2017, MNC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amount of $573,653 from the United States Department of Agriculture's Child and Adult Care Food Program;

(5)    For FY 2016/2017, MNC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amounts of $4,060,811 from the California Department of Education; and

(6)    For FY 2016/2017, MNC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amount of $3,634,834 from San Francisco (involving federal and California funds).

26.    Further, the Nonprofit Partners reported to their grant issuers or grant administrators that previously applied for and awarded grant funds originating from the

-12-

Government and/or California agencies would be used for the down payment, mortgage debt service and/or other operations at the 1850 Bryant Land project, including but not limited to:

    i.    During or about the Fall of 2015, SFCC notified, and received approval from, the Proposition 40 California State Acquisition Fund that its previously awarded $1,275,000 down payment grant would be used toward the purchase of a business condominium at the 1850 Bryant Street project;

    ii.    During or about the Fall of 2015, SFCC notified, and received approval from, CalRecycle that its previously awarded $1,567,229 operating grant would be used towards the operating expenses, including but not limited to mortgage debt service, at the 1850 Bryant Street project; and

    iii.    During or about the Fall of 2015, NMC notified, and received approval from, the Federal Head Start Program, California Department of Education, San Francisco, and Low Income Investment Fund[3] that their previously awarded $8,106,354, $2,232,266, $8,566,216, and $500,000, respectively, operating grants would be used towards the operating expenses, including but not limited to mortgage debt service, at the 1850 Bryant Street project.

27.    Further, Beckham is informed and believes, and upon such information and belief alleges, that the following grant applications were submitted to the Nonprofit Space Investment Fund (which utilizes both federal and California funds) for down payment assistance toward their purchase of a business condominium at the 1850 Bryant Street project:

    i.    On or about March 18, 2017, Muttville and Horizons Unlimited each applied for $1 million grants; and

    ii.    On or about September 8, 2017, Muttville, Horizons Unlimited, and TIDES each applied $1 million grants.

---

[3]San Francisco's and Low Income Investment Fund's grants include funds originating from the Government and California.

28.     During and between 2015 and June 2017, the Bryant Land defendants, the Kaslofsky defendants, Beckham, San Francisco's Leifheit and employees from San Francisco's Real Estate Department, Mayor's office, Public Works Department, Human Services Agency, and City Administrator's Office generated and obtained local community support for the 1850 Bryant Street project to be developed into a Nonprofit Multi-Tenant Center which would serve the local community through, among other things, more than 25 meetings with the local community, an on-line petition (see, https://www.change.org/p/city -of-san-francisco-support-for-a-nonprofit-social-innovation-center) digitally advertised by the above individuals, presentations during October 2016 and September 2017 to the general public about the 1850 Bryant Street project, and news articles and meetings with nonprofit organizations other than Nonprofit Partners mentioned in paragraph 24, above.

29.     On or about September 9, 2016, Kaslofsky printed a "test fit" spreadsheet at Nuru's San Francisco office reflecting that the Subject Property was to be developed into a Single Use City Facility housing San Francisco departments (such as the Police Department's Special Investigations Department) and UCSF.  Such uses are incompatible with a Nonprofit Multi-Tenant Center.

30.     As part of the fraudulent scheme, during or about early 2016 SFCIF provided documentation to the Nonprofit Partners indicating that SFCIF was awarding $20 million to the Bryant Land defendants to develop the Subject Property into a Nonprofit Multi-Tenant Center, even though SFCIF and Kelly knew, and were part of Defendants' fraudulent scheme, that the Nonprofit Partners would not be able to purchase the business condominiums at the Subject Property.

31.     During or about early 2017, in support of the Bryant Land defendants' attempts to have the San Francisco Planning Commission approve the Subject Property as a Nonprofit Multi-Tenant Center project, the Bryant Land defendants and Kaslofsky submitted, or caused to be submitted, to the Planning Commission information supporting the financial feasability of the development of the Subject Property as a Nonprofit Multi-Tenant Center project, including documentation reflecting that the Nonprofit Partners were utilizing grant funds

-14-

1   originating from the Government and/or California to purchase business condominiums at the

2   Subject Property upon completion of the project.

3       32.   With the support of the local community, on or about June 1, 2017 the San

4   Francisco Planning Commission approved the 1850 Bryant Street project to be developed into

5   a Nonprofit Multi-Tenant Center.

6       33.   On or about August 1, 2017, after Foley signed a term sheet financing agreement

7   with Goldman Sachs's Urban Investment Arm (to finance the development of the Subject

8   Property only as a Nonprofit Multi-Tenant Center project), Foley admitted to Beckham that

9   "now I will do my 'real deal' with Thor [Kaslofsky]." Beckham later learned that Foley was

10  indicating that he would proceed with the Backroom Deal.

11      34.   Most if not all of the grant funds originating from the Government's HHS and

12  HUD were administered, awarded and issued by San Francisco, even though San Francisco,

13  SFCIF and Kelly, among others, knew that the Nonprofit Partners' grant applications were

14  based upon Defendants' misrepresentations that the Subject Property was being built as a

15  Nonprofit Multi-Tenant Center project from which the Nonprofit Partners would purchase

16  business condominiums to serve the local community.

17      35.   However, the representations to the Nonprofit Partners, the local community,

18  and the agencies awarding federal and/or California grant funds to the Nonprofit Partners were

19  false in that, among other things, the Bryant Land defendants always intended (a) not to

20  develop the Subject Property into a Nonprofit Multi-Tenant Center, nor sell business

21  condominiums to the Nonprofit Partners, but instead, (b) to lease or sell the Subject Property

22  to San Francisco as a Single-Use City Facility (a portion of which was to be leased to UCSF)

23  in exchange for San Francisco selling, or providing an option to purchase, 170 Otis to the

24  Bryant Land defendants.  At all times relevant, Kaslofsky, SFCIF, Kelly and San Francisco

25  were aware of said Bryant Land defendants' decision and intentions, and the falsity of said

26  representations.  Instead, the Bryant Land defendants, Kaslofsky, SFCIF, Kelly and San

27  Francisco concealed and did not reveal same to the Government, California, the Nonprofit

28  Partners, nor the local community when (a) grant funds originating from the Government or

-15-

California were considered and/or approved to the Nonprofit Partners, and/or (b) the Bryant Land defendants, the Kaslofsky defendants, SFCIF, Kelly and San Francisco misrepresented that the Subject Property was being built as a Nonprofit Multi-Tenant Center project.

36.     Much of the grant funds originating from the Government's HHS and HUD were federal block grants administered, awarded and issued by San Francisco, which in turn were awarded and issued to the Nonprofit Partners.  During and between 2015 and at least 2019, San Francisco periodically, and at least annually, (a) reported to the Government that such grants were properly awarded and administered by San Francisco even though San Francisco knew that such grant funds issued to the Nonprofit Partners were issued based upon the falsity that the Nonprofit Partners would purchase business condominiums at the Subject Property, and (b) concealed from the Government that the Nonprofit Partners would not purchase business condominiums at the Subject Property and thus did not qualify for the grants.

37.     Further, the grant funds originating from the Government and California would not have been applied for by, nor issued to, the Nonprofit Partners had the Defendants truthfully revealed that the Subject Property would not be a Nonprofit Multi-Tenant Center project, but instead, intended to be leased or sold to San Francisco as a Single-Use City Facility (a portion of which was to be leased to UCSF).  Beckham is informed and believes, and upon such information and belief alleges, that these grant funds amounted to millions of dollars.

38.     After the Planning Commission approved the 1850 Bryant Street project to be developed into a Nonprofit Multi-Tenant Center, the 1850 Bryant Land defendants and Kaslofsky began trying to dismantle the 1850 Bryant Street project.

39.     During or about August 2017, Beckham and Kaslofsky met Leifheit at her San Francisco City Hall office, during which Leifheit advised that she had learned from her sources that Kaslofsky was trying to have San Francisco acquire the development of 1850 Bryant as a Single-Use City Facility, instead of the Non-Profit Partners purchasing business condominiums at the 1850 Bryant Street Project's Nonprofit Multi-Tenant Center project. However, Kaslofsky denied such as unfounded rumors.

-16-

40.     During or about August 2017, Beckham learned that the Bryant Land defendants and Kaslofsky had not caused the Subject Property to be zoned into business condominium parcels, as they had agreed to do.  As one of the Nonprofit Partners need to close its purchase of its business condominium in the near future, this omission reflects that the Bryant Land defendants and Kaslofsky had no intention to proceed with the 1850 Bryant Land project.

41.     During or about October 2017, the Bryant Land defendants found the anchor Nonprofit Partner, Goodwill, another location to purchase in the City of San Francisco.

42.     Kaslofsky ceased being a member of Common Ground during or about January 2018.

43.     Pursuant to the Backroom Deal, during or about January 2018 the Bryant Land defendants submitted an application to the San Francisco Planning Department to administratively change, without local community input, the Planning Commission's conditional use permit to allow for the construction of the Subject Property into a Single-Use City Facility instead of a Nonprofit Multi-Tenant Center.  During or about May 2018, this application was denied.  Eventually, during October 2021 the Bryant Land defendants submitted an application to the San Francisco Planning Department to administratively change, without local community input, the Planning Commission's conditional use permit to allow for the construction of the Subject Property into a Single-Use City Facility instead of a Nonprofit Multi-Tenant Center.  During or about December 2021, this application was approved.

44.     During or about the first half of 2019, Beckham reviewed Kaslofsky's email correspondence sent through or received by Common Ground's email server, and discovered, among other things, that San Francisco had a Backroom Deal with the 1850 Bryant Land defendants and Kaslofsky that was inconsistent with 1850 Bryant Street project being built as a Nonprofit Multi-Tenant Center.  The Summer of 2016 through January 2018 emails reflect that Foley instructed Kaslofsky to thwart agreements (letters of intent, term sheets, meetings) with the Nonprofit Partners about purchasing business condominiums from the 1850 Bryant Street project.  The emails further reflect Kaslofsky communicating with San Francisco

-17-

officials about San Francisco's  use of the building as a Single-Use City Facility.

FIRST CLAIM FOR RELIEF

(Violation of 31 U.S.C. § 3729(a) against all Defendants)

45.     Beckham realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth at length.

46.     At all times mentioned, Defendants routinely and repeatedly violated 31 U.S.C. § 3729(a)(1) by:

      i.    Knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval to the Government or recipients of Government funds;

      ii.    Knowingly making, using, and/or causing to be made or used, false records or statements material to false or fraudulent claims or approval to the Government or recipients of Government funds;

      iii.    Knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and

      iv.    Conspiring to commit a violation of subparagraph (i), (ii) and/or (iii), above.

47.     As a result of their conduct, Defendants are liable to the Government for three times the amount of damages sustained by the Government as a result of the false and fraudulent records, statements, claims and/or concealment practices alleged above.

48.     As a result of Defendants' conduct, 31 U.S.C. § 3729(a)(1) provides that Defendants are liable to the Government for civil penalties between $5,000 and $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each such false and fraudulent records, statements, claims and/or concealment.

49.     Beckham is also entitled to recover attorney's fees, costs and expenses from

-18-

1  Defendants pursuant to 31 U.S.C. § 3730(d).

2  SECOND CLAIM FOR RELIEF

3  (Violation of *California Government Code* § 12651(a) against all Defendants)

4      50.    Beckham realleges and incorporates by reference all prior paragraphs of this

5  complaint as though fully set forth at length.

6      51.    At all times mentioned, Defendants routinely and repeatedly violated *California*

7  *Government Code* § 12651(a) by:

8          i.    Knowingly presenting, or causing to be presented, false or fraudulent

9  claims for payment or approval to California or recipients of California

10  funds;

11          ii.    Knowingly making, using, and/or causing to be made or used, false

12  records or statements material to the Nonprofit Partners' applications for

13  grants funded in whole or in part by California;

14          iii.    Knowingly making, using, or causing to be made or used a false record

15  or statement material to an obligation to pay or transmit money or

16  property to the state or to any political subdivision, or knowingly

17  concealing or knowingly and improperly avoiding, or decreasing an

18  obligation to pay or transmit money or property to the state or to any

19  political subdivision; and

20          iv.    Conspiring to commit a violation of subparagraph (i), (ii) and/or (iii),

21  above.

22      52.    As a result of its conduct, Defendants are liable to California for three times the

23  amount of damages sustained by California as a result of the false and fraudulent records,

24  statements, claims and/or concealment practices alleged above.

25      53.    As a result of Defendants' conduct, *California Government Code* § 12651(a)

26  provides that Defendants are liable to California for civil penalties between $5,500 and

27  $11,000 for each such false and fraudulent records, statements, claims and/or concealment.

28      54.    Beckham is also entitled to recover attorney's fees, costs and expenses from

-19-

1    Defendants pursuant to *California Government Code* § 12652(g)(8).

2

3                                 PRAYER FOR RELIEF

4         WHEREFORE, Plaintiff and *Qui Tam* Relator Leiasa Beckham prays for relief as

5    follows:

6                           FOR THE FIRST CLAIM FOR RELIEF

7         1.      Treble the Government's damages according to proof;

8         2.      Civil penalties according to proof;

9         3.      A relator's award of up to 30% of the amounts recovered by or on behalf of the

10   Government;

11        4.      Attorney's fees and expenses pursuant to 31 U.S.C. § 3730(d);

12                         FOR THE SECOND CLAIM FOR RELIEF

13        5.      Treble California's damages according to proof;

14        6.      Civil penalties according to proof;

15        7.      A relator's award of up to 50% of the amounts recovered by or on behalf of

16   California;

17        8.      Attorney's fees and expenses pursuant to *California Government Code* §

18   12652(g)(8);

19   / / /

20   / / /

21

22

23

24

25

26

27

28

1    FOR ALL CLAIMS FOR RELIEF

2        9.    For costs incurred; and

3        10.    Such other and further relief as the Court deems just and proper.

4

5    THE BALL LAW FIRM

6    MORROW LAW GROUP

7    HANAGAMI LAW
     A Professional Corporation

8

9    Dated: March 10, 2023        By:*/s/William K. Hanagami*

10       William K. Hanagami
         Attorneys for Plaintiff and *Qui Tam* Relator,
         Leiasa Beckham

11

12   DEMAND FOR JURY TRIAL

     Plaintiff and *Qui Tam* Relator Leiasa Beckham requests a trial by jury.

13

14   THE BALL LAW FIRM

15   MORROW LAW GROUP

16   HANAGAMI LAW
     A Professional Corporation

17

18   Dated: March 10, 2023        By:*/s/William K. Hanagami*

19       William K. Hanagami
         Attorneys for Plaintiff and *Qui Tam* Relator,
         Leiasa Beckham

20

21

22

23

24

25

26

27

28

-21-