**William K. Hanagami, SBN 119832**
**HANAGAMI LAW**
**A PROFESSIONAL CORPORATION**
**913 TAHOE BOULEVARD, SUITE 5**
**INCLINE VILLAGE, NV 89451-7414**
**(833) 716-8570 / (833) 716-8569** *FAX*
**Bill@Hanagami.com**

**Byron T. Ball, CA SBN 150195**
**THE BALL LAW FIRM**
**100 Wilshire Boulevard, Suite 700**
**Santa Monica, CA 90401-3602**
**(310) 980-8039**
**btb@balllawllp.com**

**Gregory J. Morrow, CA SBN 153224**
**MORROW LAW GROUP**
**10401 Wilshire Boulevard, Suite 1102**
**Los Angeles, CA 90024-4609**
**(310) 894-9149 / (310) 470-9013** *FAX*
**gregory.j.morrow@hotmail.com**

Attorneys for Plaintiff and *Qui Tam* Relator,
Leiasa Beckham

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* LEIASA BECKHAM, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> 1850 BRYANT LAND LLC, et al., <br><br> Defendants. | CASE NO.: 3:21-cv-05742-RS <br><br> RESPONSE TO JOINT MOTION TO DISMISS THIRD AMENDED COMPLAINT <br><br> DATE: June 15, 2023 <br> TIME: 1:30 p.m. <br> CRTM: 3 |

 COMES NOW, Plaintiff and Relator Leiasa Beckham, and submits the following

Memorandum of Points and Authorities in Response to Defendants' Joint Motion to Dismiss the Third

Amended Complaint.

/ / /

/ / /

-i-

THE BALL LAW FIRM
MORROW LAW GROUP
HANAGAMI LAW, A.P.C.

Dated: April 24, 2023                    By: */s/William K. Hanagami*
                                             William K. Hanagami
                                             Attorneys for Plaintiff and Relator,
                                             Leiasa Beckham

# TABLE OF CONTENTS

Argument                                                                                              Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

I.      INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                1.      Relator Leiasa Beckham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                2.      Plaintiff United States. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                3.      Plaintiff State of California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                4.      Defendants 1850 Bryant Land LLC, Christopher Foley,
                        and Douglas Ross . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                5.      Defendants Kaslofsky & Associates LLC and Thurston Kaslofsky . . . . . . 4

                6.      Defendant City and County of San Francisco. . . . . . . . . . . . . . . . . . . . . 4

                7.      Defendant San Francisco Community Investment Fund (SFCIF) . . . . . . . . 5

                8.      Defendant Naomi Kelly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      THE DEFENDANTS' FRAUDULENT SCHEME . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        A.      THE COURT MUST ACCEPT AS TRUE ALL FACTUAL
                ALLEGATIONS IN THE TAC, DRAW INFERENCES
                FROM THOSE ALLEGATIONS IN THE LIGHT MOST
                FAVORABLE TO THE PLAINTIFF, AND CONSTRUE
                THE TAC LIBERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.      DEFENDANTS VIOLATED THE FCA AND CFCA BY
                (A) INDUCING OTHERS TO SUBMIT FALSE CLAIMS FOR
                PAYMENT OF FEDERAL AND CALIFORNIA GRANT
                FUNDS, RESPECTIVELY, AND/OR (B) MAKING, USING
                OR CAUSING TO BE MADE OR USED A FALSE RECORD
                OR STATEMENT MATERIAL TO A FALSE CLAIM. . . . . . . . . . . . . . . . . . . 16

        C.      DEFENDANTS VIOLATED THE "REVERSE FALSE
                CLAIMS" AND CONSPIRACY PROVISIONS OF THE FCA. . . . . . . . . . . . . 18

        D.      THE TAC ALLEGES SUFFICIENT FACTS FOR
                ACTIONABLE VIOLATIONS OF THE FCA AND CFCA . . . . . . . . . . . . . . . 18

        E.      THE TAC ALLEGES THAT KELLY WAS ACTING AS
                A BOARD MEMBER AND OFFICER OF SFCIF . . . . . . . . . . . . . . . . . . . . . 20

F.     IN THE ALTERNATIVE, RELATOR SHOULD BE GRANTED
LEAVE TO FURTHER AMEND HER COMPLAINT . . . . . . . . . . . . . . . . . . . . . 20

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## CASES

Page(s)

<u>Federal</u>
*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) . . . . . . . . . . . . . . . . . 15

*Balistreri v. Pacifica Police Dept.*, 901 F.2d 696 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 20

*Bly-Magee v. State of California*, 236 F.3d 1014 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ebeid, ex rel. United States v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . 15

*San Carlos Apache Tribe v. Becerra,* 53 F.4th 1236 (9th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . 15

*Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393 (9th Cir. 1986) . . . . . . . 20

*United States v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . 15

*United States, ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890 (9th Cir. 2017) . . . . . . . 16, 17

*United States, ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011) . . 16, 17

*United States, ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016) . 15, 18

<u>California</u>
*Fassberg Construction Co. v. Housing Authority of City of Los Angeles,*
      (2007) 152 Cal.App.4th 720, 60 Cal.Rptr.3d 375 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATUTES

Page(s)

<u>Federal</u>
31 U.S.C. §§ 3729, et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*
31 U.S.C. § 3729(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-18, 20
31 U.S.C. § 3729(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
31 U.S.C. § 3729(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Fed.R.Civ.P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Fed.R.Civ.P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Fed.R.Civ.P. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>California</u>
*Calif. Gov. C.* §§ 12650, et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*
*Calif. Gov. C.* § 12650(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
*Calif. Gov. C.* § 12651(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17-18, 20

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>.

Defendants 1850 Bryant Land LLC, Kaslofsky & Associates LLC, Thurston Kaslofsky, Christopher Paul Foley, and Douglas Ross entered into a secret "Backroom Deal" with defendants City and County of San Francisco (San Francisco), San Francisco Community Investment Fund (SFCIF), and Naomi Kelly, among others, in which the former defendants would develop and lease or sell the real property located at 1850 Bryant Street, San Francisco, California (the "Subject Property") to defendant San Francisco as a Single-Use City Facility, a portion of which San Francisco would lease to the University of California at San Francisco (UCSF).  However, Defendants knew that the Subject Property did not have local community support needed for the development of the Subject Property for such purpose, which was necessary for the San Francisco Planning Commission's permitting approval of the development as a Single-Use City Facility.

Defendants thus devised a scheme to obtain community support for the development of the Subject Property by fraudulently representing to the local community and nonprofit organizations that the Subject Property would be developed as a Nonprofit Multi-Tenant Center project, of which condominiums would be sold to various nonprofit organizations to serve the local community, when in fact Defendants knew that Defendants 1850 Bryant Land LLC, Kaslofsky & Associates LLC, Thurston Kaslofsky, Christopher Paul Foley, and Douglas Ross had no intention of selling such condominiums to the nonprofit organizations.  Defendants made such false misrepresentations to gain community support for the development of the building, which was necessary for the San Francisco Planning Commission's permitting approval of the development.  After the Planning Commission approved the development of the building as a Nonprofit Multi-Tenant Center project with the local community's support, Defendants' scheme was to refuse to proceed with the sale of the condominiums to the nonprofit organizations, and to instead seek an administrative variance (without the need for a public hearing or local community support) from the San Francisco Planning Department to permit approval of the development as a Single-Use City Facility and  proceed with their plans to lease or sell the building to San Francisco as a Single-Use City Facility, a portion of which was to be leased to

-1-

UCSF (which does not constitute a Nonprofit Multi-Tenant Center project).

Defendants intended and knew that their fraudulent scheme would result, and did result, in the nonprofit organizations applying for and obtaining grant funds originating from the United States (Government) and California based upon the nonprofit organizations believing that they would purchase business condominiums at the Subject Property. As part of Defendants' scheme, Defendants used the approval of such grants to the nonprofit organizations in seeking the Planning Commission's approval of the Subject Property's development as a Nonprofit Multi-Tenant Center project.

In violation of the Federal and California False Claims Acts, Defendants' frauds resulted in the application for, and award of, millions of dollars in grant funds originating from the Government and/or California to the nonprofit organizations which were based upon such nonprofit organizations supposedly purchasing and operating from business condominiums at the Subject Property as a Nonprofit Multi-Tenant Center project.

As discussed below, the Third Amended Complaint (TAC) alleges sufficient facts showing that Defendants' fraudulent scheme induced the nonprofit organizations to submit applications for the award of, and resulted in the award of, Government and California grant funds, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, et seq. (FCA) and California False Claims Act, *Calif. Gov. C.* §§ 12650, et seq. (CFCA), warranting the complete denial of Defendants' joint motion to dismiss. Alternatively, Relator requests leave to further amend her complaint.

II.     SUMMARY OF FACTS.

        A.      THE PARTIES.

                1.      Relator Leiasa Beckham.

Relator Leiasa Beckham ("Beckham" or "Relator") is a highly credentialed real estate developer who has about twenty (20) years of real estate experience specializing in grassroots development projects that serve the affordable housing social enterprise, and nonprofit sectors. She holds a Bachelor's and Master's degrees in Urban Studies and Planning, and has worked on several notable projects in the city of San Francisco, including The City of San Francisco's Central Market Economic Strategy, Community Arts Stabilization Trust, San Francisco Nonprofit Displacement Program, the Artist Replacement Building for the Hunter's Point Shipyard, and the San Francisco

-2-

Community Land Trust's 55 Columbus in Chinatown. As such, and over the course of her career, Beckham has become widely recognized by her peers as an expert in the field of non-profit real estate development and finance. (Dkt. #66 at ¶12.)  (Unless otherwise indicated, all paragraph (¶) citations are to the TAC, Dkt. #66.)

Formerly a Senior Real Estate Consultant at Northern California Community Loan Fund (NCCLF) in which she assisted nonprofits in securing more than 500,000 sq. ft. of commercial space, Beckham established her own company to specialize in and exclusively focus on ethical redevelopment commercial real estate transactions. In doing so, Beckham recruited defendant Kaslofsky—a former employee of the San Francisco Redevelopment Agency—to partner with her in establishing the company. (¶13.)  On April 27, 2016, Beckham and Kaslofsky founded Common Ground Urban Development, LLC, a California limited liability company (Common Ground), with the stated goal of building inclusive equitable real estate development projects that leverage the unrealized potential of distressed properties. (¶14.)  At that time, and as a limited liability company, Beckham and Kaslofsky were each considered a "Manager" of Common Ground.[1]  Common Ground's first—and only—project at the time was working on the real property development project located at the Subject property.  (*Id.*)  The real estate development project of the Subject Property as represented by the Defendants to Beckham, general public, and nonprofit entities purchasing business condominiums therein is referred to as the "1850 Bryant Street project."  The 1850 Bryant Street project was promoted to be a 172,000 sq. ft. new construction Nonprofit Multi-Tenant Center in San Francisco's Mission District, business condominiums of which were to be purchased and occupied by nonprofit organizations serving the local community.  (*Id.*)

Beckham bases her allegations that the Defendants violated the FCA and CFCA based upon, among other things, (a) her professional experience and expertise, (b) her working on the 1850 Bryant Street project, (c) her personal interactions with the Defendants, nonprofit organizations that agreed to purchase business condominiums in the 1850 Bryant Street project's Nonprofit Multi-Tenant Center, and members of the local community, (d) review of defendant Kaslofsky's email

---

[1]Kaslofsky ceased being a member of Common Ground during January 2018.  (¶42.)

-3-

correspondence sent through or received by Common Ground's email server, and (e) her review of documents she obtained from San Francisco pursuant to the San Francisco Sunshine Ordinance (San Francisco Administrative Code, Chapter 67). (¶15.)

2.    Plaintiff United States.

The United States Government (Government) funded grants, including federal block grants through the Department of Health and Human Services (HHS) and the Department of Housing and Urban Development (HUD), that were applied for by, and awarded to, the nonprofit organizations that had contracted to purchase business condominiums at the Subject Property. Most, if not all, of the grant funds originating from the Government's HHS and HUD were administered, awarded and issued by defendant City and County of San Francisco. (¶25-26, 34, 36.)

3.    Plaintiff State of California.

Plaintiff State of California (California), through its agencies, including but not limited to CalRecycle, California State Proposition 40 Acquisition Fund, California Natural Resources Agency, California Department of Education, and California Conservation Corps, funded grants that were applied for by, and awarded to, the nonprofit organizations that had contracted to purchase business condominiums at the Subject Property. (¶¶25-26.)

4.    Defendants 1850 Bryant Land, Christopher Foley, and Douglas Ross.

Defendant 1850 Bryant Land LLC (Bryant Land) is a real estate developer that held an option to purchase, and then owned after executing such option, the Subject Property. (¶16.) Defendants Christopher Foley and Douglas Ross are Bryant Land's managers and/or members. (¶7.) Bryant Land, Foley and Ross are collectively referred to as "Bryant Land defendants."

5.    Defendants Kaslofsky & Associates LLC and Thurston Kaslofsky.

Defendants Kaslofsky & Associates LLC (K&A) and Thurston Kaslofsky (collectively, "Kaslofsky") were consultants for the Bryant Land defendants. (¶8.)

6.    Defendant City and County of San Francisco.

Defendant City and County of San Francisco (San Francisco) administered the block grant funds from the Government's HHS and HUD that were awarded and issued to nonprofit organizations that had contracted to purchase business condominiums at the Subject Property. (¶34.) San Francisco

-4-

entered into a scheme with the other defendants to induce nonprofit organizations to submit grant applications that falsely indicated the grants would be used towards the down payment and mortgage payments[2] of the nonprofits' purchase of business condos at the Subject Property. (¶¶16-44.) San Francisco authorized the issuance of federally-funded grants to the nonprofits knowing that their applications were false, and also (a) misrepresented to the grant authorizing agencies that the grants issued to the nonprofits were appropriately awarded and administered, and (b) concealed to the grant authorizing agencies that the grants issued to the nonprofits were based on false information. (¶34-36.)

### 7. Defendant San Francisco Community Investment Fund (SFCIF).

Defendant SFCIF is a nonprofit corporation whose board members and staff were also employees of San Francisco. (¶10.) SFCIF provides real estate development funds. As part of Defendants' fraudulent scheme, SFCIF provided documentation to San Francisco Conservation Corps (SFCC), Goodwill, Mission Neighborhood Centers (MNC), Horizons Unlimited, Blue Bear School of Music, TIDE, and Muttville (collectively, "Nonprofit Partners") indicating that SFCIF was awarding $20 million to the Bryant Land defendants to develop the Subject Property into a Nonprofit Multi-Tenant Center, even though SFCIF knew of and was part of Defendants' fraudulent scheme and that the Nonprofit Partners would ultimately not be able to purchase the business condominiums at the Subject Property. (¶¶18, 25, 30, 34, 35.)

### 8. Defendant Naomi Kelly.

Defendant Naomi Kelly (Kelly) was the City Administrator for San Francisco, a committee member of the San Francisco Capital Committee, and a board member and/or officer of SFCIF. (¶11.)

### B. THE DEFENDANTS' FRAUDULENT SCHEME.

The TAC alleges sufficient factual details of the Defendants' fraudulent scheme to induce the Nonprofit Partners to apply for and obtain federal and California grant funds to the detriment of the Government and California.

At all times relevant, the Bryant Land defendants held an option to purchase, or owned after executing such option, the Subject Property. (¶16.) During and after 2014, all Defendants and their

---

[2]Grants including mortgage payments were submitted annually.

relevant employees were aware that: (a) the Bryant Land defendants needed the San Francisco Planning Committee's approval to develop the Subject Property, (b) obtaining the San Francisco Planning Commission's approval to develop the Subject Property required the support and approval of the local community, (c) the local community would oppose the development of Subject Property into a Single-Use City Facility owned or leased by San Francisco, with a portion thereof to be leased to UCSF, (d) the local community's opposition to developing the Subject Property would result in the Planning Commission not approving such development, (e) the local community supported and would approve of the development of the Subject Property into a Nonprofit Multi-Tenant Center, business condominiums of which were to be purchased and occupied by nonprofit organizations that provided services to the local community, and (f) nonprofit organizations that provided services to the local community needed federal and/or state grant funds to acquire business condominiums at the Subject Property and support their operations there. (¶17.)

Since May 2014, San Francisco and its employees, including but not limited to John Updike (San Francisco's Director of Real Estate), Olson Lee of the Mayor's office, Mohamed Nuru (Director of Public Works), and Trent Rhorer (Executive Director of Human Services Agency), SFCIF and Kelly, among others, wanted the Subject Property to be developed into a Single-Use City Facility to be used in whole or in part by San Francisco's departments and agencies, including but not limited to its Police Department's Special Investigations Division, and a portion of which was to be leased to UCSF. (¶18.) However, San Francisco and its above-mentioned employees, knew that they would not be able to obtain local community support for the development of the Subject Property for such use, and therefore would not be able to obtain Planning Commission approval for the Subject Property as a Single-Use City Facility. (*Id.*) Accordingly, during March or April 2015, San Francisco, SFCIF and said employees approached Foley and Ross and formed a "Backroom Deal" that San Francisco would enter into a long term lease of, or purchase, the Subject Property, as a Single-Use City Facility for use by San Francisco's Police Department and other city departments (a portion of which was to be leased to UCSF pursuant to written agreements dated, among others, July 15, 2015, February 13, 2017, July 13, 2018, and October 18, 2018), and San Francisco would sell the real property located at 170 Otis Street, San Francisco, California (170 Otis) at favorable terms to the Bryant Land

-6-

defendants if the Bryant Land defendants were able to develop the Subject Property as a Single-Use City Facility. (*Id*.) Because San Francisco, SFCIF, said employees, and the Bryant Land defendants knew that the local community would not support such a development, and that local community support was required to develop the Subject Property into a Single-Use City Facility, the Bryant Land defendants, San Francisco, SFCIF and said employees, decided that in order to obtain local community support for the development and Planning Commission approval, that they would misrepresent to the local community and the Planning Commission that the Subject Property would be developed into a Nonprofit Multi-Tenant Center project, which would house the operations of nonprofit organizations serving the local community. (*Id*.) As part of the scheme, said Defendants and employees agreed that after the Planning Commission approved the project for a Nonprofit Multi-Tenant Center project with support from the local community, said Defendants and employees would have the project's development approval modified administratively, without a public hearing nor local community input, as a Single-Use City Facility so that San Francisco could lease or purchase the Subject Property and lease a portion of it to UCSF. (*Id*.)

In furtherance of the Backroom Deal (a) on November 20, 2015, Ross and Foley formed defendant Bryant Land, and shortly thereafter Bryant Land acquired an option to purchase the Subject Property (¶19), and (b) on January 19, 2016 the Bryant Land defendants submitted an application to the Planning Commission for a conditional use authorization to develop the Subject Property into a Nonprofit Multi-Tenant Center. (¶20.)

By February 2016, Kaslofsky became aware of and agreed to participate in Defendants' Backroom Deal. During February 2016, Kaslofsky, working as a consultant and agent for the Bryant Land defendants, had meetings with the San Francisco Office of Community Investments and Infrastructure regarding general obligation bond financing for the development of the Subject Property into a Single-Use City Facility. (¶21.) Such bond financing is incompatible with the development of, and nonprofit acquisition of business condominiums at, a Nonprofit Multi-Tenant Center. (*Id*.)

During the Summer and Fall of 2015, Bryant Land's Foley and Ross knowingly misrepresented to Beckham that the 1850 Bryant Street project involved the development of the Subject Property into a Nonprofit Multi-Tenant Center, business condominiums of which were to be purchased and

occupied by nonprofit organizations that provided services to the local community. (¶22.) Foley and Ross told Beckham that they wanted to retain her services to facilitate and obtain the entitlements and financing for the 1850 Bryant Land project, including but not limited to (a) obtaining San Francisco Planning Commission approval for the development of the Subject Property into a Nonprofit Multi-Tenant Center, and (b) assisting the Nonprofit purchasers of business condominiums at the Nonprofit Multi-Tenant Center to obtain financing, through among other things, federal and/or state funded grants for the Nonprofits' down payment and/or debt service payments of mortgage loans to be used towards their acquisition of such business condominiums. (*Id*.)

During April 2016, defendant Bryant Land retained Common Ground to facilitate and obtain the entitlements and financing for the 1850 Bryant Land project, including but not limited to (a) obtaining San Francisco Planning Commission approval for the development of the Subject Property into a Nonprofit Multi-Tenant Center, and (b) helping the Nonprofit purchasers of business condominiums at the Nonprofit Multi-Tenant Center to obtain financing, through among other things, federal and/or state funded grants for  Nonprofits' down payment and/or debt service payments of mortgage loans to be used towards their purchase of such business condominiums. (¶23.)

During and between 2015 and 2018, the Bryant Land defendants, the Kaslofsky defendants, Beckham, and San Francisco's Lex Leifheit (Nonprofit Business Development Manager of San Francisco's Office of Economic and Workforce Development), Lee, Nuru, and Kelly, among others, advised various nonprofit organizations in numerous telephone calls to all Nonprofit Partners; numerous emails by the Bryant Land defendants, Kaslofsky, K&A, Lee's staff (including but limited to Brian Chu and Leifheit), Nuru and his staff (including but not limited to Mindy Linetzky), and Kelly's staff (including but not limited to Jamie Querubin and Holly Lung) to all Nonprofit Partners between July 2015 and December 2018, and Beckham's emails to nonprofit organizations including the Nonprofit Partners between and during and between 2015 and 2017; numerous meetings by the Bryant Land defendants, Kaslofsky and Leifheit at least weekly with the Nonprofit Partners during and between 2015 and 2018; Beckham's near daily meetings with the Nonprofit partners during 2016 and 2017; and weekly written promotional materials provided by Foley, Beckham, Kaslofsky, K&A to nonprofit organizations during 2016 and 2017; Common Ground's website; and newspaper articles

-8-

identified in the TAC about the Bryant Land defendants' purported intent to develop the Subject Property into a Nonprofit Multi-Tenant Center project that would provide nonprofit services to the local community. (¶24.)

In reliance thereon, during and between 2015 and at least 2018, the Nonprofit Partners agreed to purchase condominiums at the Subject Property and at least annually applied for and/or obtained grant funds (for the down payment and/or mortgage debt service) originating from Government agencies, including but not limited to the HHS and HUD, and California agencies, including but not limited to CalRecycle, California State Proposition 40 Acquisition Fund, California Natural Resources Agency, California Department of Education, and California Conservation Corps, with the understanding and requirement that such Nonprofit Partners were purchasing condominiums for their respective operations to serve the local community at the Subject Property Nonprofit Multi-Tenant Center project. (¶25.) Such grant applications that were submitted and awarded include:

i. SFCC grant applications that were submitted and awarded:

(1) For Fiscal Year (FY) 2015/2016[3] and FY 2016/2017, SFCC applied for and was awarded down payment grants of $25,000 and $765,200 (awarded May 22, 2017), respectively, from the San Francisco Mayor's Sustainability Initiative (involving federal and California funds);

(2) For FY 2015/2016 and FY 2018/2019, SFCC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amounts of $1,585,725, and $1,701,030, respectively, from CalRecycle;

ii. Goodwill grant applications that were submitted and awarded:

(1) For FY 2015/2016, Goodwill applied for and was awarded an operating grant, including but not limited to expected mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amount of $95,871 from the Department of Labor under the Federal Workforce Investment Act;

(2) For FY 2015/2016, Goodwill applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land

---

[3]Each Fiscal Year (FY) begins on June 1 through May 31. For example, FY 2015/2016 is from June 1, 2015 through May 31, 2016.

project, in the total amount of $60,546,921from San Francisco (involving federal and California funds);

      iii.    MNC grant applications that were submitted and awarded:

      (1)    For FY 2016/2017 and FY 2017/2018, MNC applied for and was awarded a down payment grants in the amounts of $500,000 and $1,200,000 (awarded March 28, 2018), respectively, from the Low Income Investment Fund (involving federal and California funds);

      (2)    For FY 2016/2017, MNC applied for and was awarded down payment grants in the total amounts of $1,000,000 and $1,000,000 from NCCLF  (awarded November 2017 and involving federal and California funds) and San Francisco (awarded March 5, 2018 and involving federal and California funds), respectively;

      (3)    For FY 2016/2017, MNC applied for and was awarded operating grants, including but not limited to expected mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amount of $4,589,193 from the Federal Head Start program;

      (4)    For FY 2016/2017, MNC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amount of $573,653 from the United States Department of Agriculture's Child and Adult Care Food Program;

      (5)    For FY 2016/2017, MNC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amounts of $4,060,811 from the California Department of Education; and

      (6)    For FY 2016/2017, MNC applied for and was awarded operating grants, including but not limited to mortgage debt service, for nonprofit services at the 1850 Bryant Land project, in the amount of $3,634,834 from San Francisco (involving federal and California funds). (¶25.)

Further, in reliance upon Defendants' misrepresentations, the Nonprofit Partners reported to their grant issuers or grant administrators that previously applied for and awarded grant funds originating from the Government and/or California agencies would be used for the down payment, expected mortgage debt service and/or other operations at the 1850 Bryant Land project, including but

-10-

not limited to:

i. During the Fall of 2015, SFCC notified, and received approval from, the Proposition 40 California State Acquisition Fund that its previously awarded $1,275,000 down payment grant would be used toward the purchase of a business condominium at the 1850 Bryant Street project;

ii. During the Fall of 2015, SFCC notified, and received approval from, CalRecycle that its previously awarded $1,567,229 operating grant would be used towards the operating expenses, including but not limited to mortgage debt service, at the 1850 Bryant Street project; and

iii. During the Fall of 2015, NMC notified, and received approval from, the Federal Head Start Program, California Department of Education, San Francisco, and Low Income Investment Fund[4] that their previously awarded $8,106,354, $2,232,266, $8,566,216, and $500,000, respectively, operating grants would be used towards the operating expenses, including but not limited to mortgage debt service, at the 1850 Bryant Street project. (¶26.)

Further, in reliance upon Defendants' misrepresentations, on March 18, 2017, Muttville and Horizons Unlimited and on then September 8, 2017, Muttville, Horizons Unlimited, and TIDES, each submitted a $1 million grant application to the Nonprofit Space Investment Fund (which utilizes both federal and California funds) for down payment assistance toward their purchase of a business condominium at the 1850 Bryant Street project. (¶27.)

During and between 2015 and June 2017, the Bryant Land defendants, the Kaslofsky defendants, Beckham, San Francisco's Leifheit and employees from San Francisco's Real Estate Department, Mayor's office, Public Works Department, Human Services Agency, and City Administrator's Office generated and obtained local community support for the 1850 Bryant Street project to be developed into a Nonprofit Multi-Tenant Center which would serve the local community through, among other things, more than 25 meetings with the local community, an on-line petition, presentations during October 2016 and September 2017 to the general public about the 1850 Bryant Street project, and news articles. (¶28.)

On September 9, 2016, Kaslofsky printed a "test fit" spreadsheet at Nuru's San Francisco

---

[4]San Francisco's and Low Income Investment Fund's grants include funds originating from the Government and California. (¶26, fn. 3.)

office reflecting that the Subject Property was to be developed into a Single-Use City Facility housing San Francisco departments (such as the Police Department's Special Investigations Department) and UCSF reflecting that Defendants intended to pursue their Backroom Deal scheme. (¶29.) Such uses are incompatible with a Nonprofit Multi-Tenant Center.

As part of the fraudulent scheme, during early 2016 SFCIF provided documentation to the Nonprofit Partners indicating that SFCIF was awarding $20 million to the Bryant Land defendants to develop the Subject Property into a Nonprofit Multi-Tenant Center, even though SFCIF and Kelly knew, and were part of Defendants' fraudulent scheme, that the Nonprofit Partners would not be able to purchase business condominiums at the Subject Property. (¶30.)

During early 2017, in support of the scheme to have the San Francisco Planning Commission initially approve the Subject Property as a Nonprofit Multi-Tenant Center project, the Bryant Land defendants and Kaslofsky submitted, or caused to be submitted, to the Planning Commission information supporting the financial feasability of the development of the Subject Property as a Nonprofit Multi-Tenant Center project, including documentation reflecting that the Nonprofit Partners were utilizing grant funds originating from the Government and/or California to purchase business condominiums at the Subject Property upon completion of the project. (¶31.)

With the support of the local community created by Defendants' fraudulent scheme, on June 1, 2017 the San Francisco Planning Commission approved the 1850 Bryant Street project to be developed into a Nonprofit Multi-Tenant Center. (¶32.)

On August 1, 2017, after Foley signed a term sheet financing agreement with Goldman Sachs's Urban Investment Arm (to finance the development of the Subject Property only as a Nonprofit Multi-Tenant Center project), Foley admitted to Beckham that "now I will do my 'real deal' with Thor [Kaslofsky]." Beckham later learned that Foley was indicating that he would proceed with the Backroom Deal. (¶33.)

The Defendants' representations to the Nonprofit Partners, the local community, and the agencies awarding federal and/or California grant funds to the Nonprofit Partners were knowingly false in that, among other things, the Bryant Land defendants always intended (a) not to develop the Subject Property into a Nonprofit Multi-Tenant Center, nor sell business condominiums to the

-12-

Nonprofit Partners, but instead, (b) to lease or sell the Subject Property to San Francisco as a Single-Use City Facility (a portion of which was to be leased to UCSF) in exchange for San Francisco selling, or providing an option to purchase, 170 Otis to the Bryant Land defendants. (¶35.) At all times relevant, Kaslofsky, SFCIF, Kelly and San Francisco were aware of said Bryant Land defendants' decision and intentions, and the falsity of said representations. (*Id.*) Instead, the Bryant Land defendants, Kaslofsky, SFCIF, Kelly and San Francisco concealed and did not reveal same to the Government, California, the Nonprofit Partners, nor the local community when (a) grant funds originating from the Government or California were considered and/or approved to the Nonprofit Partners, and/or (b) the Bryant Land defendants, the Kaslofsky defendants, SFCIF, Kelly and San Francisco misrepresented that the Subject Property was being built as a Nonprofit Multi-Tenant Center project. (*Id.*)

Most of the grant funds originating from HHS and HUD were federal block grants administered, awarded and issued by San Francisco, which in turn were awarded and issued to the Nonprofit Partners, even though San Francisco, SFCIF and Kelly, among others, knew that the Nonprofit Partners' grant applications were based upon Defendants' misrepresentations that the Subject Property was being built as a Nonprofit Multi-Tenant Center project from which the Nonprofit Partners would purchase business condominiums to serve the local community, and thus did not qualify for HHS and HUD grant monies. (¶¶34, 36.) During and between 2015 and at least 2019, San Francisco periodically, and at least annually, (a) reported to the Government that such grants were properly awarded and administered by San Francisco even though San Francisco knew that such grant funds issued to the Nonprofit Partners were issued based upon the falsity that the Nonprofit Partners would purchase business condominiums at the Subject Property, and (b) concealed from the Government that the Nonprofit Partners would not purchase business condominiums at the Subject Property and thus did not qualify for the grants. (¶36.)

The grant funds originating from the Government and California would not have been applied for by, nor issued to, the Nonprofit Partners had the Defendants truthfully revealed that the Subject Property would not be a Nonprofit Multi-Tenant Center project, but instead, intended to be leased or sold to San Francisco as a Single-Use City Facility (a portion of which was to be leased to UCSF).

-13-

(¶37.) These grant funds amounted to millions of dollars. (*Id.*)

After the Planning Commission approved the 1850 Bryant Street project to be developed into a Nonprofit Multi-Tenant Center, the 1850 Bryant Land defendants and Kaslofsky began trying to dismantle the 1850 Bryant Street project. (¶38.) During August 2017, Beckham learned that the Bryant Land defendants and Kaslofsky had not caused the Subject Property to be zoned into business condominium parcels, as they had agreed to do. (¶40.) As one of the Nonprofit Partners need to close its purchase of its business condominium in the near future, this omission reflects that the Bryant Land defendants and Kaslofsky had no intention to proceed with the 1850 Bryant Land project. (*Id.*) Next, during October 2017 the Bryant Land defendants found the anchor Nonprofit Partner, Goodwill, another location to purchase in the City of San Francisco. (¶41.) Finally, pursuant to the Backroom Deal, during January 2018 the Bryant Land defendants submitted an application to the San Francisco Planning Department to administratively change, without local community input, the Planning Commission's conditional use permit to allow for the construction of the Subject Property into a Single-Use City Facility instead of a Nonprofit Multi-Tenant Center, which was denied. (¶43.) During October 2021, the Bryant Land defendants again submitted an application to the San Francisco Planning Department to administratively change, without local community input, the Planning Commission's conditional use permit to allow for the construction of the Subject Property into a Single-Use City Facility instead of a Nonprofit Multi-Tenant Center., which was approved during December 2021. (*Id.*)

During the first half of 2019, Beckham reviewed Kaslofsky's email correspondence sent through or received by Common Ground's email server, and discovered, among other things, that San Francisco had a Backroom Deal with the 1850 Bryant Land defendants and Kaslofsky that was inconsistent with 1850 Bryant Street project being built as a Nonprofit Multi-Tenant Center. (¶44.) The Summer of 2016 through January 2018 emails reflect (a) Foley instructed Kaslofsky to thwart agreements (letters of intent, term sheets, meetings) with the Nonprofit Partners about purchasing business condominiums from the 1850 Bryant Street project, and (b) Kaslofsky communicating with San Francisco officials about San Francisco's use of the building as a Single-Use City Facility. (*Id.*)

/ / /

-14-

III.    LEGAL ARGUMENT.

A.    THE COURT MUST ACCEPT AS TRUE ALL FACTUAL ALLEGATIONS IN THE TAC, DRAW INFERENCES FROM THOSE ALLEGATIONS IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF, AND CONSTRUE THE TAC LIBERALLY.

*Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

To overcome a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). When considering a Rule 12(b)(6) motion, the court must construe all factual allegations in the complaint as true and in the light most favorable to the plaintiff. *San Carlos Apache Tribe v. Becerra,* 53 F.4th 1236, 1239, fn.2 (9th Cir. 2022).

Claims under the FCA must be specific enough so that each defendant knows of the particular misconduct alleged to constitute fraud. *Bly-Magee v. State of California*, 236 F.3d 1014, 1018 (9th Cir. 2001). However, "[t]here is no flaw in a pleading . . . where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States, ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016). Under Fed.R.Civ.P. 9(b), the TAC must allege "the circumstances of fraud . . . with particularity, but that other facts may be plead generally or in accordance with" Fed.R.Civ.P. 8. *United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011).

The TAC is not required to "identify representative examples of false claims to support every allegation." *Swoben*, 848 F.3d at 1180, *quoting, Ebeid, ex rel. United States v. Lungwitz,* 616 F.3d 993, 998 (9th Cir. 2010). Rather, it is sufficient to allege the particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted. *Swoben*, 848 F.3d at 1180; *Ebeid,* 616 F.3d at 998-999.

Further, a Relator need not plead that the Government or California will suffer monetary harm to state a claim under the FCA or CFCA because the FCA and CFCA require the court to award civil penalties for each false claim or statement submitted to the Government, even if no damages were caused by the false submissions. 31 U.S.C. § 3729(a)(1); *Calif. Gov. C.* § 12651(a); *Bly-Magee v. California,* 236 F.3d 1014, 1017 (9th Cir. 2001).

-15-

B. **DEFENDANTS VIOLATED THE FCA AND CFCA BY (A) KNOWINGLY INDUCING OTHERS TO SUBMIT FALSE CLAIMS FOR PAYMENT OF FEDERAL AND CALIFORNIA GRANT FUNDS, RESPECTIVELY, AND/OR (B) KNOWINGLY MAKING, USING OR INDUCING OTHERS TO MAKE OR USE A FALSE RECORD OR STATEMENT MATERIAL TO A FALSE CLAIM.**

The FCA is violated if a defendant:

"(A) knowingly[5] presents, **or causes to be presented**, a false or fraudulent claim[6] for payment or approval; [or]

(B) knowingly makes, uses, **or causes to be made or used**, a false record or statement material to a false or fraudulent claim."

31 U.S.C. § 3729(a)(1)(A)-(B) (**bold added**). Under these provisions, a defendant that knowingly induces another to (a) present a false or fraudulent claim for payment or approval for Government funds, or (b) make or use a false record or statement material to a false or fraudulent claim, violates the FCA. *United States, ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 903 (9th Cir. 2017) ["those who cause false statements to be used" violate the FCA]; *United States, ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 379-389 (1st Cir. 2011) [Medical device manufacturer violated the FCA by knowingly inducing a hospital and physician to submit false claims to Medicare]. Further, a defendant that knowingly makes a false record or statement material to a false claim for Government funds violates 31 U.S.C. § 3729(a)(1)(B). Contrary to the Defendants' assertions, a defendant's receipt of Government funds is not required to violate these statutes.

Likewise, the CFCA is violated if a defendant:

"(1) Knowingly[7] presents **or causes to be presented** a false or

---

[5]Under the FCA, "knowing" and "knowingly" means (a) having actual knowledge of the information, (b) acting in deliberate ignorance of the truth or falsity of the information, or (c) acting in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

[6]Under the FCA, a "claim" includes any request or demand for money, regardless of whether the Government has title to the money, that (a) is presented to an officer, employee or agent of the Government, or (b) is made to a contractor, grantee or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest when the Government provided any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A).

[7]The CFCA's definition of "knowing" and "knowingly" is nearly identical to the FCA's definition of those terms. *Calif. Gov. C.* § 12650(b)(3). *See,* 31 U.S.C. § 3729(b)(1)(A).

fraudulent claim[8] for payment or approval, [or]

(2) Knowingly makes, uses, **or causes to be made or used** a false record or statement material to a false or fraudulent claim."

*Calif. Gov. C.* § 12651(a)(1)-(2) (**bold added**).  Under these provisions, as with 31 U.S.C. § 3729(a)(1)(A)-(B), a defendant that knowingly induces another to (a) present a false or fraudulent claim for payment or approval for California funds, or (b) make or use a false record or statement material to a false or fraudulent claim, violates the CFCA.  *Campie*, 862 F.3d at p. 903;  *Hutcheson*, 647 F.3d at 379-389.[9]  Further, a defendant that knowingly makes a false record or statement material to a false claim for California funds violates *Calif. Gov. C.* § 12651(a)(2).  A defendant's receipt of California funds is not required to violate these statutes.

Accordingly, Defendants violate 31 U.S.C. § 3729(a)(1)(A) and *Calif. Gov. C.* § 12651(a)(1) by knowingly inducing others, such as the Nonprofit Partners, to submit false applications for federal and California grant funds, respectively.  (¶¶23-28.)  Likewise, Defendants violate 31 U.S.C. § 3729(a)(1)(B)  and *Calif. Gov. C.* § 12651(a)(2) by knowingly making a false record or statement material such false claims, such as (a) making statements to the Nonprofit Partners that 1850 Bryant was being built as a Nonprofit Multi-Tenant Center and that business condos therein would be sold to the Nonprofit Partners even though Defendants had already entered into the "backroom deal," causing the Nonprofit Partners to submit grant applications for Government and California funds (¶¶23-28), and (b) San Francisco misrepresenting to the Government that the HHS and HUD funded grants were properly awarded to the Nonprofit Partners. (¶¶34-36.)

/ / /

---

[8]Under the CFCA, a "claim" includes any request or demand for money, regardless of whether California or a political subdivision has title to the money, that (a) is presented to an officer, employee or agent of California or a political subdivision, or (b) is made to a contractor, grantee or other recipient, if the money is to be spent or used on a California or political subdivision program, if the California or political subdivision provided any portion of the money requested or demanded.  *Calif. Gov. C.* § 12650(b)(1).

[9]As acknowledged by Defendants, case authority applying the FCA is persuasive because the CFCA is substantially similar to the FCA, the federal courts' analysis of the FCA may be persuasive to the analysis of the CFCA to the extent the language of the two acts is similar.  *Fassberg Construction Co. v. Housing Authority of City of Los Angeles,* (2007) 152 Cal.App.4th 720, 735, 60 Cal.Rptr.3d 375, 389.

-17-

C. **DEFENDANTS VIOLATED THE "REVERSE FALSE CLAIMS" AND CONSPIRACY PROVISIONS OF THE FCA.**

31 U.S.C. § 3729(a)(1)(G) ("reverse false claim") is violated if the Defendant:

> "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, . . . ."

Here, San Francisco misrepresented to the Government that the HHS and HUD funded grants administered by San Francisco were properly awarded to the Nonprofit Partners, thus preventing the Government from recovering the improperly issued grants from the Nonprofit Partners. (¶¶25, 34-36.)

The FCA and CFCA is violated is the defendant "conspires to commit a violation of" of the FCA and CFCA, respectively. 31 U.S.C. § 3729(a)(1)(C); *Calif. Gov. C.* § 12651(a)(3), such as here where the Defendants entered into a scheme to induce the Nonprofit Partners to submit false applications for federal and California grant funds. (¶¶25-27, 31.)

D. **THE TAC ALLEGES SUFFICIENT FACTS FOR ACTIONABLE VIOLATIONS OF THE FCA AND CFCA.**

The TAC alleges sufficient facts for actionable violations of the FCA and CFCA because it alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Swoben*, 848 F.3d at 1180.

The TAC alleges that during March or April 2015, defendants SFCIF, Kelly, and San Francisco, through its various named managers and employees, entered into the "Backroom Deal" with defendants Bryant Land, Foley and Ross, to, among other things, induce the Nonprofit Partners to agree to purchase business condominiums at the Subject Property as part of Defendants' scheme to obtain local community support to obtain construction permits to develop the Subject Property, which San Francisco would ultimately purchase instead of the Nonprofit Partners. (¶18.) Kaslofsky joined the Backroom Deal by February 2016. (¶21.) Each of the Defendants and their identified employees and agents knowingly[10] induced the Nonprofit Partners to submit grant applications for

---

[10]At all times relevant, all Defendants knew that their representations to the Non-Profit Partners that the Subject Property was being built as a Nonprofit Multi-Tenant Center were false. (¶¶18, 21, 24, 35.)

federal and California grant funds (detailed examples are listed in ¶¶25-27) that falsely stated that the grant funds would be used for the down payments and debt service needed to purchase business condos at the Subject Property, by (a) approaching the Nonprofit Partners during and between 2015 and 2017 via numerous meetings, telephone calls, emails, promotional materials, website, and newspaper articles misrepresenting that the Subject Property would be developed into a Nonprofit Multi-Tenant Center, knowing and intending that the Nonprofit Partners would apply for such grants to purchase business condos at said project (¶24), (b) during early 2016, SFCIF provided documentation to the Nonprofit Partners indicating SFCIF was awarding $20 million to the Bryant Land defendants to develop the Subject Property into a Nonprofit Multi-Tenant Center, even though SFCIF knew of and was part of Defendants' fraudulent scheme and that the Nonprofit Partners would not be able to purchase the business condominiums at the Subject Property (¶30), and (c) during early 2017, submitting, or caused to be submitted, to the Planning Commission documentation showing that the Nonprofit Partners were utilizing federal and California grant funds to purchase business condos at the Subject Property. (¶31.)

However, Defendants' misrepresentations to the Nonprofit Partners, the local community, and the agencies awarding federal and/or California grant funds to the Nonprofit Partners were materially false because the Nonprofit Partners would not have applied for the grants, and grant issuers would not have awarded grants, had Defendants truthfully revealed that the Subject Property was going to be a Single-Use City Facility, and not a Nonprofit Multi-Tenant Center. (¶¶18, 21, 35, 37.)

Further, the Bryant Land defendants, Kaslofsky, SFCIF, Kelly and San Francisco concealed and did not reveal same to the Government, California, the Nonprofit Partners, nor the local community when (a) grant funds originating from the Government or California were considered and approved to the Nonprofit Partners, and/or (b) the Bryant Land defendants, Kaslofsky, SFCIF, Kelly and San Francisco misrepresented that the Subject Property was being built as a Nonprofit Multi-Tenant Center project. (¶21.) Further, during and between 2015 and at least 2019, San Francisco periodically, and at least annually, (a) reported to the Government that such federal grants were properly awarded and administered by San Francisco even though San Francisco knew that such grant funds issued to the Nonprofit Partners were based upon the falsity that the Nonprofit Partners would

-19-

purchase business condominiums at the Subject Property, and (b) concealed from the Government that the Nonprofit Partners would not purchase business condominiums at the Subject Property and thus did not qualify for the federally funded grants. (¶25, 34, 35, 37.) Further, the federal and California grant funds would not have been approved or issued if the Government and California had known that the Subject Property was not being developed as a Nonprofit Multi-Tenant Center, but rather as a Single-Use City Facility. (¶¶35-37.)

As a result, the Government and California were damaged and are entitled to recover civil penalties under 31 U.S.C. § 3729(a)(1) and *Calif. Gov. C.* § 12651(a). (¶¶25-27, 45-48, 50-53.)

E. <u>THE TAC ALLEGES THAT KELLY WAS ACTING AS A BOARD MEMBER AND OFFICER OF SFCIF</u>.

Kelly argues that she should be dismissed from the second claim for relief (CFCA) because she was a governmental employee of San Francisco. (San Francisco moving papers, Dkt. #67 at 18:3-13.) However, Kelly has personal CFCA liability for her role in acting as SFCIF's board member and officer. (¶11.) SFCIF is a Nonprofit organization and not a municipality. (¶10; *see also,* ¶¶18, 25, 30, 34, 35.) Accordingly, Kelly should not be dismissed from the CFCA claim for relief because she is a "person" subject to the CFCA. *Calif. Gov. C.* § 12650(b)(9).

F. <u>IN THE ALTERNATIVE, RELATOR SHOULD BE GRANTED LEAVE TO FURTHER AMEND HER COMPLAINT</u>.

Leave to amend a complaint "shall be freely given when justice so requires."" Fed.R.Civ.P. 15(a). "The standard for granting leave to amend is generous." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 701 (9th Cir. 1990). The TAC is the second version of Relator's complaint that has been attacked by a motion to dismiss. Leave to amend should be denied only if the Court determines that "allegation(s) of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). In the event the Court grants any portion of the joint motion to dismiss, Relator requests leave to file a further amended complaint to correct any deficiency.

IV. <u>CONCLUSION</u>.

For all of the foregoing reasons, the court should deny the joint motion to dismiss. Alternatively, the Court should grant Relator leave to amend her complaint.

-20-

THE BALL LAW FIRM
MORROW LAW GROUP
HANAGAMI LAW, A.P.C.

Dated: April 24, 2023      By:*/s/William K. Hanagami*
         William K. Hanagami
         Attorneys for Plaintiff and Relator,
         Leiasa Beckham

-21-