UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiffs,

v.

1850 BRYANT LAND LLC, et al.,

Defendants.

Case No. 21-cv-05742-RS

**ORDER DENYING MOTION TO DISMISS**

## I. INTRODUCTION

In the operative Third Amended Complaint ("TAC"), *qui tam* Relator Leiasa Beckham renews her averments of deceit in a local development project. After the First Amended Complaint was dismissed, Relator added further details of Defendants' alleged scheme to induce local nonprofits to apply for state and federal government grants under false pretenses. Defendants have jointly filed a motion to dismiss, arguing the TAC still fails to state a viable claim under either the federal False Claims Act ("FCA") or its California analogue (the "CFCA"). For the reasons discussed below, the motion is denied.

## II. BACKGROUND[1]

As described previously, this case centers on a "secret backroom agreement" purportedly

---

[1] This section is based on the averments in the TAC, which must be taken as true for purposes of the motion to dismiss. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018).

formed in connection with an aborted local development project at 1850 Bryant Street in San Francisco. Dkt. 60 ("MTD Order"), at 5. Defendants, who formed the agreement among themselves, comprise multiple groups. First, 1850 Bryant Land LLC, managed by Defendants Christopher Paul Foley and Douglas Ross, owned the commercial property located at that address. Kaslofsky & Associates LLC and Defendant Thurston Kaslofsky served as consultants for 1850 Bryant Land LLC. Finally, the City and County of San Francisco, the San Francisco Community Investment Fund ("SFCIF"), and Naomi Kelly (then-City Administrator and SFCIF board member) (collectively, "the City") directed the City's involvement in the 1850 Bryant project. Relator herself is a real estate developer and consultant who, in April 2016, formed Common Ground Urban Development, LLC ("Common Ground"), with Thurston Kaslofsky.

Starting in the summer of 2015, Defendants began promoting the development of a "Nonprofit Multi-Tenant Center" at 1850 Bryant Street. Dkt. 66 ("TAC") ¶ 23. The idea was to create a space out of which local nonprofits could provide community services.[2] Things began moving forward in earnest in late 2015, when 1850 Bryant Land LLC was formed and purchased the property; in January 2016, it applied for a "conditional use authorization" from the San Francisco Planning Commission to develop the Nonprofit Center. *Id.* ¶ 20. In April 2016, 1850 Bryant retained Relator and Common Ground to "facilitate and obtain the entitlements and financing" for the project, including working toward final Planning Commission approval and helping nonprofits apply for federal and state grants to purchase business condominiums in the Nonprofit Center. *Id.* ¶ 23. Relator worked on this project and communicated regularly with the City about it throughout 2016 and 2017.

Yet things were not as they seemed. Relator alleges that the entire premise of developing the Nonprofit Center was a ruse: Defendants' real objective was to develop a "Single-Use City Facility" at 1850 Bryant, which would be used by the San Francisco Police Department and

---

[2] These nonprofits included, among others, the San Francisco Conservation Corps, Goodwill, Mission Neighborhood Centers, Horizons Unlimited, Blue Bear School of Music, TIDE, and Muttville. TAC ¶ 25.

UCSF. *Id.* ¶ 35. However, Defendants knew this proposal would not garner the necessary community support to secure approval from the Planning Commission. Thus, in March or April 2015, City employees, including Kelly and others, formed the so-called "backroom deal" with Foley and Ross: they would all work together to misrepresent that 1850 Bryant would be turned into the Nonprofit Multi-Tenant Center, but after the Planning Commission approved the project, they would obtain an administrative variance to allow the development of the City Facility instead. *See id.* ¶ 18. This variance would not require community support. In exchange for their complicity, 1850 Bryant would be given the option to buy a different City-owned property "at favorable terms." *Id.*

The FAC discussed this scheme at a high level, and the City and 1850 Bryant each filed separate motions to dismiss, with Kaslofsky joining each. Both motions were granted because, although the FAC revealed "some details of a generalized scheme" to defraud, it did not include "nearly enough to satisfy Rule 9(b)'s requirements." MTD Order at 5 (quoting in part *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182 (9th Cir. 2016)). Specifically, Relator did not "describe who in particular within the Defendant organizations discussed executing the averred scheme or when the 'secret backroom agreement' was formed." *Id.* Indeed, "the only details of its formation [were] contained in a single conclusory sentence" in the FAC. *Id.* (citing Dkt. 21 ("FAC") ¶ 14). The order granted the motions with leave to amend, requiring Relator to provide "a more fulsome showing" to avoid future dismissal. *Id.* at 6.

Relator thereafter filed the operative TAC,[3] which includes further details suggesting the existence of the scheme. For example, in September 2016, "Kaslofsky printed a 'test fit' spreadsheet . . . reflecting that [1850 Bryant] was to be developed into" the City Facility, rather than the Nonprofit Center. TAC ¶ 29. Further, after Foley obtained financing for the Nonprofit Center from Goldman Sachs, he admitted to Relator that he would now "do my 'real deal' with

---

[3] Relator filed a Second Amended Complaint after the FAC was dismissed, and the parties stipulated to the filing of the TAC. *See* Dkt. 64.

1  [Kaslofsky]," which Relator would later learn meant Foley intended to proceed as part of the
2  backroom deal. *Id.* ¶ 33. Around August 2017, Relator also discovered that 1850 Bryant and
3  Kaslofsky had not obtained proper zoning approval for the Nonprofit Center, despite having
4  agreed to do so and despite the fact that the Planning Commission had already approved the
5  development of the Nonprofit Center by that time. *See id.* ¶ 40. That same month, in a meeting
6  with Relator and Kaslofsky, a City employee indicated she had "learned from her sources that
7  Kaslofsky was trying to have [the City] acquire the development of 1850 Bryant as [the City
8  Facility]," which Kaslofsky denied as "unfounded rumors." *Id.* ¶ 39. Relator also alleges that she
9  has reviewed Kaslofsky's emails "sent through or received by Common Ground's email server,"
10 and that these provide further evidence of the backroom deal. *Id.* ¶ 44.

11  The backroom deal finally came to fruition when, in January 2018, Bryant Land first applied to have the property conditionally approved for development as the City Facility; after nearly four years of wrangling, the Planning Commission approved that application in December 2021. This approval, effectively abandoning the Nonprofit Center concept, came after the nonprofits had collectively applied for and were awarded millions of dollars in federal and state grant funding. *See id.* ¶¶ 25–27. In the TAC, Relator avers that Defendants "routinely and repeatedly" violated the FCA and the CFCA by inducing the nonprofits to apply for these grants under false pretenses. *Id.* ¶¶ 46, 51. Defendants have jointly moved to dismiss.

### III. LEGAL STANDARD

**A. Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). When evaluating such a motion, courts generally "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving

1  party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). However, "[t]hreadbare recitals of
2  the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*,
3  556 U.S. at 678.
4      For actions sounding in fraud, the complaint "must state with particularity the
5  circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This includes claims brought
6  under the FCA and CFCA. *See Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637
7  F.3d 1047, 1054–55 (9th Cir. 2011). Such averments "must be accompanied by 'the who, what,
8  when, where, and how' of the misconduct charged," such that they are "specific enough to give
9  defendants notice of the particular misconduct." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124
10 (9th Cir. 2009) (first quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003);
11 and then quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). Knowledge may
12 be pleaded generally under Rule 9(b), but the complaint "must set out sufficient factual matter
13 from which a defendant's knowledge of a fraud might reasonably be inferred." *United States ex*
14 *rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679–80 (9th Cir. 2018).

### B. FCA & CFCA Claims

The FCA seeks to protect the public fisc by "requiring those who seek public funds to act with scrupulous regards for the requirements of law." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 63 (1984). The CFCA contains "statutory provisions that are substantially identical" to the FCA, and thus the same analysis is applied for claims under both statutes. *United States v. Safran Grp.*, No. 15-CV-00746-LHK, 2017 WL 235197, at *4 (N.D. Cal. Jan. 19, 2017). To prevail, a relator must prove the existence of "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

While the archetypical FCA case is that of an insider blowing the whistle on a fraud perpetrated by their employer against the government, the "scope of false or fraudulent claims should be broadly construed." *Id.* at 1170; *see also Ebeid ex rel. United States v. Lungwitz*, 616

1  F.3d 993, 995–96 (9th Cir. 2010) (recognizing that "outsiders" can bring FCA claims). So, for

2  instance, "a person need not be the one who actually submitted the claim forms [to the

3  government] in order to be liable." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001).

4  The claim for payment "must be false when made," and "[i]nnocent mistakes, mere negligent

5  representations and differences in interpretation" will not suffice. *United States ex rel. Hopper v.*

6  *Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996). While a relator need not disclose each and every

7  instance of a false claim being submitted to the government, they must nonetheless disclose the

8  fraud "with some level of specificity," as well as "reasonable indicia that false claims were

9  actually submitted." *Ebeid*, 616 F.3d at 999.

10  Next, "[a] person 'knowingly' submits a false claim not only when he or she 'has actual

11  knowledge of the information,' but also when he or she 'acts in deliberate ignorance' or 'reckless

12  disregard' of the truth or falsity of the information." *United States ex rel. Lee v. SmithKline*

13  *Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001). While scienter can be pleaded generally

14  under Rule 9(b), "an inference of scienter must be more than merely plausible or reasonable — it

15  must be cogent and at least as compelling as an opposing inference or nonfraudulent intent."

16  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). For a false statement to be

17  material, it must have "a natural tendency to influence, or be capable of influencing, the payment

18  or receipt of money or property." 31 U.S.C. § 3729(b)(4). Finally, where an FCA complaint

19  involves multiple defendants, a claim will lie only where the complaint identifies "the role of each

20  defendant in the alleged fraudulent scheme." *United States ex rel. Swoben v. United Healthcare*

21  *Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016).

## IV. DISCUSSION

23  In their motion to dismiss, Defendants jointly argue Relator has still failed to state a viable

24  FCA or CFCA claim, due to her failure to plead three required elements: (1) that a false claim or

25  statement was made; (2) that Defendants possessed the requisite scienter; and (3) that any such

26  false statements were material. They further argue the TAC still does not contain sufficient details

27  of the averred scheme, and that the TAC does not viably allege a conspiracy among Defendants.

1   Relator's opposition principally rehashes the TAC, with limited argument against the attacks

2   levied in the motion. Nonetheless, the TAC adequately avers falsity, scienter, and materiality, and

3   it adds necessary details surrounding the scheme and the conspiracy between Defendants.

4   Dismissal is therefore unwarranted.

### A. False Claims

Defendants begin by arguing that the TAC "fails to identify a single false claim." Dkt. 67 ("Mot."), at 9. While they concede Relator is not required to include "verbatim language of the alleged false statements," they posit that Rule 9 nonetheless requires Relator to include the "substantive content of the alleged false statements or claims." *Id.* at 11. Relator essentially argues that each of the grant applications discussed in the TAC do contain false statements — namely, that the funds would be used by the nonprofits to purchase business condos at 1850 Bryant Street, when that was never actually in the cards. *See* Dkt. 70 ("Opp."), at 19.

While the FAC included only minimal information about the grants submitted, the TAC has added further details that sufficiently aver falsity. For instance, Relator notes that Goodwill applied for and received $95,871 from the federal Department of Labor "for nonprofit services at the 1850 Bryant Land project," including for mortgage debt service. TAC ¶ 25(ii)(1). The San Francisco Conservation Corps received over $3 million in operating grants from CalRecycle for the same purpose. *Id.* ¶ 25(i)(2). Although the TAC does not include the particular grant applications or statements, such details provide reasonable indicia that false claims were submitted and that Defendants procured these claims.

Defendants rely principally for support on *United States ex rel. Durkin v. County of San Diego*, an FCA case in which the relator accused the defendant county of making false statements in connection with grants from the Federal Aviation Administration ("FAA"). The district court concluded the complaint "identified the [false] statements with sufficient particularity," including by "identif[ying] the date, document, and paraphrased content" of the statements. 300 F. Supp. 3d 1107, 1118 (S.D. Cal. 2018). Since these details are not present in the TAC, Defendants argue, the claims should be dismissed. Although *Durkin* is instructive (though, of course, non-controlling), it

1   does not suggest these details are *per se* requirements of an FCA claim. Because Relator has listed
2   with particularity many of the grants applied for and received (including their dates, sources, and
3   amount), the TAC adequately avers Defendants induced false statements to be made to the United
4   States and the State of California.

**B. Scienter**

Defendants argue the TAC fails to include plausible allegations that Defendants knew the statements were false. While conceding scienter may be pleaded generally under Rule 9, Defendants contend scienter must nevertheless be pleaded plausibly. Here, they argue, Relator's averments are all conclusory. It is certainly the case that the TAC includes numerous conclusory averments of scienter — for instance, the statement that the City "knew" it would be impossible otherwise to obtain community support for the City Project at 1850 Bryant. TAC ¶ 18. These, standing alone, would be insufficient to state an FCA claim; indeed, these types of statements were essentially all that was contained in the FAC. *E.g.*, FAC ¶ 15.

However, even to the extent the TAC states that one or more Defendants "knew" the statements were false, it does so in combination with additional facts that make the existence of this knowledge cogent. For instance, Defendants question why Foley would "spontaneously share" with Relator that he was going to do the "real deal" with Kaslofsky. Mot. at 14. Yet taking it as true that this occurred (as is required at this juncture), the reason he shared this information is unimportant. The salient question is, why would Foley say this if he lacked knowledge of the alleged backroom deal? By the same token, why would Kaslofsky have printed a test fit for the City Facility if this use was, indeed, "incompatible" with the development of the Nonprofit Center? TAC ¶ 29. Well pleaded facts such as these are sufficient to establish Defendants' knowledge, and if nothing else they support an inference of scienter based on the circumstances. The TAC thus sufficiently avers scienter.[4]

---

[4] The United States filed a statement of interest indicating its disagreement with Defendants' argument that a relator cannot rely on "collective scienter." *See* Dkt. 71. Defendants concede this area is uncertain, but they argue the TAC fails even to aver collective scienter sufficiently. As the

**C. Materiality**

Even if false statements were knowingly made, Defendants argue Relator has failed to show that they were material. Indeed, under Ninth Circuit precedent, the false statements themselves must be the "*sine qua non* of receipt of [government] funding." *Ebeid*, 616 F.3d at 998. Relator offers only a short response to this, contending the grants in general "were materially false, because the [nonprofits] would not have applied for the grants, and grant issuers would not have awarded grants," if the true objective of the 1850 Bryant project was known. Opp. at 19.

Defendants are right to note that the materiality standard is "demanding." Mot. at 12 (quoting *Durkin*, 300 F. Supp. 3d at 1125). At its core, though, materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 194 (quoting 26 R. Lord, Williston on Contracts § 69:12, at 549 (4th ed. 2003)). To this end, the TAC plausibly avers materiality since the grants at issue were applied for and disbursed "with the understanding and requirement" that they would be used to support the Nonprofit Center. TAC ¶ 25. It may very well become clear, as the case develops, that the governments' funding decisions were not tied so directly to the nonprofits' involvement with 1850 Bryant. For instance, if the nonprofits were able to retain their grant funding even after the collapse of the Nonprofit Center concept, this would substantially undercut (if not totally defeat) the notion that the Nonprofit Center was the *sine qua non* of the grant funding. *Cf. United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017). However, again taking as true Relator's averments that many of the grants were specifically intended to support the 1850 Bryant project, the materiality of the alleged misrepresentations to the provision of government funding is "a problem of proof." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 907 n.9 (9th Cir. 2017); *cf. Gharibian ex rel. United States v. Valley Campus Pharmacy*, No. 21-56253, 2023 WL 195514, at *2 (9th Cir. Jan. 17, 2023). The TAC thus provides sufficient (if thin) averments to avoid dismissal on this basis.[5]

---

TAC in any event does not rely purely on collective scienter, this thicket need not be waded into at this moment.

[5] That said, the TAC discusses numerous grants that had been "previously applied for and

**D. Details of Scheme and Conspiracy**

Finally, Defendants contend the TAC does not describe the fraud with sufficient detail to put them adequately on notice about the misconduct alleged. This includes inappropriately lumping together the misconduct of specific Defendants and failing to specify when certain acts occurred. By the same token, Defendants argue the TAC does not adequately allege a conspiracy. While Relator does not meaningfully respond to these arguments, none are persuasive.

For one thing, the TAC has refined its broad allegations into more precise ones. It provides, for instance, the names of specific City employees (John Updike, Olson Lee, Mohamed Nuru, Trent Rhorer, and Naomi Kelly[6]) who approached Foley and Ross to form the backroom deal, and others who participated in calls with the nonprofits about the project. TAC ¶¶ 18, 24. It also provides examples of actions taken by specific Defendants and discusses how the Defendants at times worked together in support of the scheme, which was not the case with the FAC. *E.g.*, *id.* ¶¶ 24, 29, 33. The TAC establishes a conspiracy by discussing its members, as noted above, and by averring the *quid pro quo* of the backroom deal — 1850 Bryant would promote the fraudulent Nonprofit Center in exchange for being able to buy the other City property on favorable terms.[7]

In addition, the TAC provides more detailed descriptions of the timeframe of the alleged scheme to advise Defendants of its contours. While some acts and forms of communication are discussed as having occurred across several years, many are stated as having occurred "weekly" or

---

awarded" but that would be repurposed to support the Nonprofit Center. TAC ¶ 26. On their face, these allegedly false statements cannot have been material to any government decisions to pay out money because those decisions had already been made at the time the grants were disbursed.

[6] Defendants argue Kelly is an improper defendant under the CFCA because she was acting in her official capacity. Mot. at 18 (citing *State of Cal. ex rel. Dockstader v. Hamby*, 75 Cal. Rptr. 3d 567, 574 (Ct. App. 2008)). Relator responds that, because Kelly served also as a board member of SFCIF, a nonprofit, she is still a proper CFCA defendant. *See* Opp. at 20. Given this dual role, and taking these averments as true, Relator's CFCA claim does not fail on this basis — though Defendants are free to renew this argument on a more fully developed record.

[7] At oral argument, counsel for Kaslofsky argued the TAC does not adequately aver that Kaslofsky participated in the backroom deal, including that he had no incentive for joining it. Perhaps, but the salient inquiry at this point is *whether* Kaslofsky participated in the fraud, not *why* he did so. On the former point, the TAC clearly alleges facts implicating his involvement.

at times "daily" within this range, making more specific references somewhat unnecessary. A series of meetings between Kaslofsky and the City involving the scheme are alleged to have occurred within the span of a month, in February 2016; and the dates of each grant application are included in the TAC specifically. Thus, the TAC does not fail for lack of adequate details, nor for failure to aver a conspiracy.

## V. CONCLUSION

The TAC has remedied the deficiencies previously identified in the FAC and now includes sufficient details to aver a fraudulent scheme under the FCA and the CFCA. Whether or not the record can be developed to prove these claims is another matter; for the time being, however, Relator has stated colorable claims. The motion to dismiss is therefore denied.

**IT IS SO ORDERED**.

Dated: June 30, 2023

_____
RICHARD SEEBORG
Chief United States District Judge